## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>No.  16-MD-2724-CMR<br>HON. CYNTHIA M. RUFE |
| IN RE:  ECONAZOLE CASES | |
| THIS DOCUMENT RELATES TO:<br><br>*ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | 16-EC-27243<br><br>Civil Action No. 17-cv-3817<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

### INDIRECT RESELLER PLAINTIFFS'

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................. 4

II.     ONGOING INVESTIGATIONS............................................................ 8

III.    THE ROLE OF INDEPENDENT PHARMACIES........................................ 12

IV.     JURISDICTION AND VENUE ........................................................... 13

V.      PARTIES .................................................................................. 14

        A.     Plaintiffs................................................................................. 14

        B.     Defendants ........................................................................... 16

        C.     Co-Conspirators ...................................................................... 16

VI.     INTERSTATE COMMERCE .......................................................... 17

VII.    BACKGROUND ON THE GENERIC DRUG INDUSTRY ......................... 17

        A.     Generic drugs are commodity products that compete on price........................... 17

        B.     Pricing of generic drugs makes unilateral price increases risky .......................... 20

VIII.   THE GENERIC ECONAZOLE CONSPIRACY .......................................... 23

        A.     Defendants increased the price of Econazole ...................................... 23

        B.     As part of the conspiracy, Defendants increased their WAC benchmarks in
               lockstep. ................................................................................. 39

        C.     There are no shortages or other market changes that would justify
               Defendants' price increases. ...................................................... 40

        D.     Defendants acknowledge the lack of generic drug competition .......................... 43

        E.     Defendants had many opportunities to conspire on Econazole .......................... 46

        F.     Defendants' concerted efforts to increase prices for Econazole yielded
               supracompetitive profits........................................................... 49

        G.     The Econazole market is susceptible to collusion ................................ 49

               1.     Industry concentration ............................................... 50

**FILED WITH REDACTIONS – PUBLIC VERSION**

2.      Barriers to entry ............................................................... 50

3.      Demand inelasticity ......................................................... 51

4.      Lack of substitutes .......................................................... 52

5.      Standardized product with high degree of interchangeability ................. 52

6.      Inter-competitor contacts and communications ........................................ 53

IX.    THE STATUTES OF LIMITATION DO NOT BAR PLAINTIFFS' CLAIMS ............ 60

A.    The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy ................................... 60

B.    Fraudulent concealment tolled the statutes of limitations.................................... 61

1.      Active concealment of the conspiracy ...................................... 62

2.      Plaintiffs exercised reasonable diligence ................................. 64

X.     CONTINUING VIOLATIONS ........................................................................ 64

XI.    DEFENDANTS' ANTITRUST VIOLATIONS............................................................ 65

XII.   CLASS ACTION ALLEGATIONS ....................................................................... 67

XIII.  CAUSES OF ACTION ....................................................................................... 70

XIV.  PRAYER FOR RELIEF ...................................................................................... 114

**FILED WITH REDACTIONS – PUBLIC VERSION**

# I.   <u>NATURE OF THE ACTION</u>

1.      This suit brings claims on behalf of indirect purchasers of generic Econazole ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise, and/or stabilize the prices of generic Econazole.

2.      Econazole is a topical antifungal cream used to treat a variety of inflammatory skin infections, including tinea pedis (athlete's foot), tinea cruris, tinea corporis (ringworm), and cutaneous candidiasis, as well as tinea versicolor.  It has been marketed in the United States for more than 30 years.  The United States Food and Drug Administration ("FDA") first approved Econazole nitrate cream in 1982 under the brand name Spectazole, which has since been discontinued.  Generic Econazole creams have been approved and available for well over a decade.

3.      For years, competition among sellers of generic Econazole kept prices stable, at low levels.  But starting at least as early as July 2014, Defendants, who dominate the market for Econazole, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented—Defendants caused the price of generic Econazole products to dramatically and inexplicably increase as much as 1,657% higher than June 2014 prices—and generic Econazole prices remain at elevated levels today.[1]  In fact, the U.S. Government Accountability Office ("GAO") identified Econazole as having experienced "an extraordinary price increase."[2]

4.      Defendants' unlawful and anticompetitive conduct in the Econazole market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

---

[1] *See infra*, Section VIII.A.

[2] GAO, GAO-16-706, Report to Congressional Requesters, Generic Drugs Under Medicare at
    Appx. III (Aug. 12, 2016) ("GAO Report"), *available at*
    http://www.gao.gov/assets/680/679022.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

5.      The price increases imposed by Defendant manufacturers of generic Econazole cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices of Econazole were the result of an illegal agreement among Defendants to fix prices.

6.      ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

7.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Econazole—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

8.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in guilty pleas for price-fixing from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[3] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[4]

---

[3] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.
[4] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

**FILED WITH REDACTIONS – PUBLIC VERSION**

9.      The Attorney General for the State of Connecticut ("Connecticut AG"), whose office is leading a group of at least 47 other State Attorney General offices in an investigation of the generic drug industry parallel to that of DOJ, has stated that there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

(a)      At this moment, the Connecticut AG and the Attorneys General of 47 other States and the District of Columbia (together, the "States") are pursuing claims against 20 defendants alleging collusion that distorted the prices of at least 15 generic drugs.[6]  The States' investigation is ongoing, and they have indicated that additional manufacturers and additional generic drugs are implicated in widespread anticompetitive conduct.  In fact, the investigation is now reported to involve at least 300 drugs, making it "most likely the largest cartel in the history of the United States."[7]

(b)      In a competitive marketplace, each generic drug manufacturer should price its drug competitively relative to other manufacturers.  Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices.  But, as uncovered by the States, the market for generic drugs has not been characterized by such competition for many years.

---

[5] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[6] *See* Plaintiff States' Consolidated Amended Complaint, Civ. No. 17-3768, MDL 2724 (June 18, 2018) ("State AG Complaint").

[7] C. Rowland, "Investigation of generic 'cartel' expands to 300 drugs," Washington Post (Dec. 9, 2018) *available at* https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html?utm_term=.bad2a37f7d93.

FILED WITH REDACTIONS – PUBLIC VERSION

(c)     The States have exposed a marketplace in which generic drug manufacturers communicated with each other to determine and agree on the amount of market share each "competitor" would be allocated.  These shares were determined by the timing of each manufacturer's entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

(d)     The purpose of the unlawful "fair share" allocation was to fix, maintain, and stabilize prices—either for a particular generic drug or any number of generic drugs.  In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug.  Manufacturers implemented the "fair share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful.  This prevented prices from declining even when a new "competitor" joined the market.

(e)     Additionally, in conjunction with their market allocation agreement, manufacturers also agreed to raise prices above competitive levels for certain drugs, and were able to maintain or slow the decline of prices for other drugs that would have been lower absent their conspiratorial agreements.

(f)     As alleged in more detail below, Defendants Perrigo, Taro, and Teligent reached a "fair share" and price-fixing agreement relating to, at least, Econazole.

10.     Manufacturers of generic Econazole are implicated in these ongoing investigations; at least two of the Defendants named here, including Perrigo and Taro, have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

**FILED WITH REDACTIONS – PUBLIC VERSION**

11.     Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Econazole.

12.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that indirectly purchased generic Econazole products manufactured by any Defendant, from July 2014 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that indirectly purchased generic Econazole products manufactured by any Defendant, from July 2014 to the present.

## II.     ONGOING INVESTIGATIONS

13.     On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President).  The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[8]

14.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[9]  Former Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained:  "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a

---

[8] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[9] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

**FILED WITH REDACTIONS – PUBLIC VERSION**

price set by the market, not by collusion."[10]   As they await sentencing, Glazer and Malek are

cooperating with DOJ's continuing investigation.   More criminal charges and guilty pleas are

expected to follow.[11]

15.     Although   initial   public   disclosures   suggested   that   the   federal   and   state

investigations were focused on one or two drugs, it is now clear that both investigations are much,

much broader.   Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing

between makers of generic pharmaceuticals is widespread."[12]

16.     According to one report, prosecutors see the investigation of the generic drug

industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's

largest criminal antitrust probe ever.   *See In re Automotive Parts Antitrust Litig*., No. 2:12-md-

02311 (E.D. Mich.).   As in that case, prosecutors expect "to move from one drug to another in a

similar cascading fashion."[13]

17.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania

have focused on at least twenty generic drug manufacturers as part of the growing investigation,

including:   Aceto Corp. ("Aceto"); Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma

USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr.

---

[10] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[11] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg; David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), *available at* https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

[12] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[13] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mallinckrodt plc ("Mallinckrodt"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Pfizer, Inc. ("Pfizer"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); West-Ward Pharmaceuticals Corp. ("West-Ward"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

18.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant. DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[14]

19.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the

---

[14] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[15]

20.      Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[16]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter."  The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[17]

21.      In addition to the federal criminal investigation, the States began an investigation in July 2014 into the dramatic price increases in generic drugs.  The State AG Complaint details frequent collusive communications between generic drug manufacturers and extensive anticompetitive conduct.

22.      The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the

---

[15] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[16] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[17] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Connecticut AG has described as "mind-boggling."[18]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.  Generic drug manufacturers exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[19]

23.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The States explain that the anticompetitive "overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in [their] Complaint."[20]  Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that Defendants, on the heels of meeting at industry events, raised Econazole prices to previously unheard-of levels.  It is clear that the large and unprecedented price increases for generic Econazole cannot be explained by normal, competitive market forces.  The explanation is collusion.

### III.     THE ROLE OF INDEPENDENT PHARMACIES

24.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target, and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

---

[18] Mark Pazniokus, "How a small-state AG's office plays in the big leagues," CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.
[19] State AG Amended Complaint ¶ 9.
[20] State AG Amended Complaint ¶ 12.

FILED WITH REDACTIONS – PUBLIC VERSION

25.     Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

## IV.     JURISDICTION AND VENUE

26.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

29.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below

has been carried out in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here.  According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[21]

30.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Econazole throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District.  In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## V.    PARTIES

### A.    Plaintiffs

31.    Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val indirectly purchased and continues to purchase Defendants'

---

[21] DOJ, Antitrust Division Manual at III-83.

FILED WITH REDACTIONS – PUBLIC VERSION

generic Econazole products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

32.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Econazole products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

33.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Econazole products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

34.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Econazole products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

35.     ~~Plaintiff Deal Drug Pharmacy ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug indirectly purchased and continues to purchase Defendants' generic Econazole products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.~~

36.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase

FILED WITH REDACTIONS – PUBLIC VERSION

Defendants' generic Econazole products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.    Defendants**

37.    Defendant Perrigo New York, Inc., is a Delaware corporation with its principal place of business in Bronx, New York.  During the Class Period, Perrigo sold Econazole to purchasers in this District and throughout the United States.

38.    Defendant Taro Pharmaceuticals USA, Inc.  is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli pharmaceutical company.  In 2010, Sun Pharmaceutical Industries Ltd., an Indian pharmaceutical company, acquired a controlling stake in Taro Pharmaceutical Industries, Ltd.  During the Class Period, Taro sold Econazole to purchasers in this District and throughout the United States.

39.    Defendant Teligent, Inc. ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey.  During the Class Period, Teligent sold generic Econazole to purchasers in this District and throughout the United States.

**C.    Co-Conspirators**

40.    Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

FILED WITH REDACTIONS – PUBLIC VERSION

## VI.   INTERSTATE COMMERCE

41.   During the Class Period, Defendants sold and distributed generic Econazole in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

42.   Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Econazole, took place within, has had, and was intended to have a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

43.   Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive generic Econazole to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VII.   BACKGROUND ON THE GENERIC DRUG INDUSTRY

### A.   Generic drugs are commodity products that compete on price

44.   Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[22]   In 2015, generic drug sales in the United States were estimated at $74.5 billion.[23]

---

[22] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.
[23] Attorney General of the State of Connecticut, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

17

**FILED WITH REDACTIONS – PUBLIC VERSION**

45.     According to the FDA, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[24]   Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[25]

46.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[26]   And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[27] Mature generic markets—like that of Econazole—typically have several manufacturers that compete for sales, hence keeping prices in check.

47.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[28]

48.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as

---

[24] FDA Website, *available at*
    http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.
[25] *Id.*
[26] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.
[27] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.
[28] GPhA Report at 1.

18

the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory

hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs.

Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing

of an Abbreviated New Drug Application ("ANDA") that establishes that its product is

bioequivalent to the branded counterpart.

49.    Since passage of the Hatch-Waxman Act, every state has adopted substitution laws

requiring or permitting pharmacies to substitute generic drug equivalents for branded drug

prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense

as written" or similar language on the prescription).

50.    Because each generic is readily substitutable for another generic of the same brand

drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are

commodity products" and, as a consequence of that, are marketed "primarily on the basis of

price."[29]  In a competitive market, generic manufacturers cannot significantly increase prices (or

maintain high prices in the face of a competitor's lower price) without losing a significant volume

of sales.

51.    It is well-established that competition among generic manufacturers drives down

price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of

sales.  When lower-priced generics become available, the brand drug quickly loses market share

as purchasers switch to the cheaper alternatives.  Over time, the price of a generic drug approaches

the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug

tends to decrease as more generic drug manufacturers enter the market:

---

[29] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011),
  *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

52.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[30]

53.     When there are multiple generic manufacturers in an established generic market—as with generic Econazole—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing of generic drugs makes unilateral price increases risky**

54.     [See note.[31]]

---

[30] GAO Report at 23.
[31] This paragraph was not included in the Aug. 2018 IRP Complaint.  For the sake of continuity, we have inserted this paragraph number but left this paragraph blank.

**FILED WITH REDACTIONS – PUBLIC VERSION**

55.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

56.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription...drugs."[32]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[33]  In effect, NADAC is "a single national average."[34]  Thus, NADAC is one way to track general price trends in the marketplace.

57.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks— like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in

---

[32] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.
[33] *Id.* at 15.
[34] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturers' reported list prices. Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[35]

58.    The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee. Over time, it was revealed that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs. As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

59.    To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs. A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

60.    Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug. So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices. A

---

[35] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry. And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing. NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets. IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

61.    Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  In a market with MAC pricing, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

## VIII.  THE GENERIC ECONAZOLE CONSPIRACY

### A.    Defendants increased the price of Econazole

62.    For years, the prices of Econazole remained relatively low and stable, as economic theory and industry experience would predict of a competitive and mature market for a generic drug.  For example, the prevailing effective price per unit for 85 grams of 1% Econazole cream was approximately ████████ in every month from at least as far back as January 2011 through September 2013.  Then things changed.  Between September 2013 and the summer of 2014, the same product that for years had cost approximately ███████████████████████ ████████████.

(a)    No supply shortages or other market events can explain the Econazole price increases.  The only relevant change in the months preceding the price increases was Teligent's entry to the market.

(b)     On February 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC.  Twice during that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three primary sellers of Econazole had opportunities to discuss Teligent's entry to the market.  Of particular note, the CEOs of Perrigo and Taro joined the Teligent CEO at the GPhA Annual Meeting on Feb. 20-22.  Jason Malek and Jeffrey Glazer of Heritage, and Rajiv Malik of Mylan, each of whom is directly implicated in the "fair share" conspiracy uncovered by the States, also attended this meeting.

(c)     During this period, Teligent—which had in the past focused on contract manufacturing and product development for other companies—announced its intent to become a generic pharmaceutical manufacturer.[36]  Its ambitions were not limited to Econazole.  Teligent touted its strategic plan to enter the market for numerous topical generic drugs.  It launched its first topical generic drug in December 2012, followed by its acquisition of the Econazole assets and ANDA from Prasco in February 2013. By September 2013, Teligent had 12 ANDAs pending at the FDA.[37]  By June 20, 2014 that number had jumped to 17, with four additional ANDAs submitted under joint-development plans with other manufacturers and another five ANDAs planned for submission by the end of 2014.[38]

(d)     When Teligent acquired the right to sell Econazole, it was the start of a publicly announced plan that would place Teligent in direct competition with Taro and Perrigo across numerous drugs.  Indeed, fast forward to the present and Teligent makes 20 topical drugs

---

[36] *See, e.g.*, IGI Laboratories Inc. 2014 Annual Report (SEC 10-K) at 3, *available at*: https://www.sec.gov/Archives/edgar/data/352998/000114420415016338/v404166_10k.htm.

[37] Teligent Press Release (Sept. 18, 2013), *available at*: http://investors.teligent.com/news-releases/news-release-details/igi-laboratories-inc-announces-twelfth-anda-submission.

[38] Teligent Press Release (June 20, 2014), *available at*: http://investors.teligent.com/news-releases/news-release-details/igi-laboratories-inc-announces-18th-and-19th-anda-submissions.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(including Econazole) in various formulations (covered by 33 ANDAs). Seventeen of these drugs are also made by Taro; 15 are also made by Perrigo.  Only two drugs in the Teligent portfolio are not made by either Perrigo or Taro.

(e)     This scenario—where a drug manufacturer plans to enter a market with established, incumbent manufacturers, and where those manufacturers are competitors or potential competitors across multiple drugs—is particularly ripe for a "fair share" agreement.  Rather than allow competition to drive the price of drugs even lower, manufacturers can instead agree to "play nice in the sandbox" and keep prices higher.  The conduct of Teligent, Perrigo and Taro after Teligent entered the Econazole market is entirely consistent with such an agreement.

(f)     Teligent finally launched Econazole under its own label in September 2013. In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share. ███████████████████████████

████████████████

(g)     █████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ Rather than competing for market share by lowering prices (or merely seeking to preserve market share by maintaining existing prices), Teligent made the economically irrational decision to *raise* prices.  On October 28-30, right before Teligent's higher prices took effect in the marketplace, representatives from Perrigo, Taro and Teligent converged at a GPhA conference and again had an opportunity to discuss Econazole market shares and pricing.

(h)     By January 2014, █████████████████████████████████████

████████████████████████████ In a competitive market, this would have provided an opportunity

for Perrigo and Taro to punish Teligent and gain market share by capitalizing on lower pricing. But that did not happen.

(i)        In February 2014, ███████████████████████████████████████
██████████████████████████████. Taro's prices remained relatively stable during these few months, but that changed after Defendants met in June 2014 at another trade conference in Maryland.

(j)        Generic pharmaceutical manufacturers met for a Generic Pharmaceutical Association conference on June 3 and 4, 2014 in North Bethesda, Maryland.  Representatives from Defendants Perrigo, Taro, and Teligent all attended.  Shortly thereafter, beginning at least as early as July 2014 and continuing to the present, Defendants formed and maintained a price-fixing cartel that included all of their generic Econazole products.  Senior executives of each Defendant reached agreement and monitored compliance.

63.        In accordance with their price-fixing agreement, Defendants caused Econazole prices to skyrocket.  Within a short period after the June 2014 industry meeting, each Econazole manufacturer dramatically raised its respective list (WAC) and effective Econazole prices.

(a)        The following table summarizes trade meetings and opportunities to conspire between Perrigo, Taro, and Teligent and shows the proximity of these meetings to the price increases that Defendants imposed.  The table also highlights meetings that are noted in the States' Complaint, as well as meetings that were attended by Heritage.

**FILED WITH REDACTIONS – PUBLIC VERSION**

█████████████████████████████████████████████████████████

(b)     Shortly before the June 2014 GPhA meeting, Perrigo implemented extraordinary price increases for its generic Econazole products.  On July 24, 2014, Perrigo announced list price (WAC) increases of more than 600%.  The list price increases were effective.

████████████████████████████████████████████████████████

████████████████████████████████████.  By September Perrigo's effective prices were up more than 800%.

(c)     Teligent quickly followed Perrigo's list price (WAC) increase.   On September 1, 2014, Teligent announced *identical* list prices to Perrigo, which amounted to increases of more than 700% over Teligent's old prices.  Teligent's list price increases also were effective. ███████████████████████████████████████████████████████

███████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

(d)   Taro, ████████████████████████████████████████████
████, followed Perrigo's lead, although with less aggressive increases (at first).  After Perrigo's list price (WAC) increases in late July 2014, ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

(e)   █████████████████████████████████████████████████ it did not announce Econazole list price (WAC) increases until November 18, 2014, at which point Taro set its list prices identical to Perrigo and Teligent.  Thus, in less than four months, Perrigo, Teligent and Taro each imposed extraordinary price increases and announced *identical* WAC prices for all three Econazole products.  As with Perrigo and Teligent, Taro's list price increases were effective. ████████████████████████████████████████████
████████████████████████

(f)   In a competitive market, when one manufacturer raises prices other manufacturers offer better prices and gain customers.  Here, rather than compete, each Defendant raised prices and maintained relatively stable market shares—a hallmark of the "fair share" agreement.  For example, in the year preceding Teligent's launch of Econazole under its own label (September 2012 through August 2013) the average monthly market share for Prasco's Econazole products (which Teligent acquired) was ██████████████████████████.  In the two years following Teligent's launch of Econazole products (September 2013 through August 2015) during which time Defendants raised prices, Teligent's average monthly market share was ████████████

28

**FILED WITH REDACTIONS – PUBLIC VERSION**

███████████ [39]   Instead of pricing opportunistically (and competitively) to gain market share, Teligent joined the collusive price increases and accepted its "fair share."

       (g)     The pricing conduct by Perrigo, Taro and Teligent was a sharp break from historical norms for Econazole.  As shown in the graphs below, the list (WAC) prices for each manufacturer were low, stable and ***different*** for many years.  For example, no Defendant at any point in at least seven years prior to the Class Period had an identical list price with another manufacturer.  Moreover, the differences between each manufacturer's list prices were significant.  For example, the spread between the lowest list price (Taro) and the highest list price (Teligent/Prasco) exceeded 20% for each Econazole product.  But that abruptly changed in the second half of 2014.

---

[39] Teligent announced the acquisition of Econazole from Prasco in February 2013 and launched under its own label in September 2013. For a period of time, Econazole under the Prasco label continued to be sold in decreasing amounts, presumably to sell off inventory.  For purposes of these market share calculations, sales by Teligent and Prasco are combined.

FILED WITH REDACTIONS – PUBLIC VERSION





**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**

(h)     The charts above make clear the abruptness and enormity of Defendants' identical list (WAC) price increases.  After many years of different prices across all products, Perrigo, Taro and Teligent aligned prices on every Econazole product and maintained uniformity through the end of 2016.

(i)     The charts above also highlight that Perrigo, Taro and Teligent list (WAC) prices remained elevated above pre-Class Period levels for years.  Although prices for all Defendants have declined from their peak, Perrigo and Taro list prices remain significantly elevated above pre-Class Period levels (more than 100%) even today.  Teligent did not lower its list prices below pre-Class Period levels until August 1, 2018.

64.     As the following graph indicates, prices for generic Econazole increased significantly.  The graph is based on National Average Drug Acquisition Cost ("NADAC") data provided to the public by the Centers for Medicare and Medicaid Services ("CMS").  NADAC data is based on a regularly-updated survey that "collects acquisition costs for covered outpatient drugs purchased by retail community pharmacies, which include invoice purchase prices from independent and chain retail community pharmacies."  Pharmacies included in the survey are from all fifty states and the District of Columbia.  CMS has explained that "NADAC is designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription and over-the-counter covered outpatient drugs."

**FILED WITH REDACTIONS – PUBLIC VERSION**



65.  Before the Class Period, the effective prices of Defendants' Econazole remained stable for years, as is typical in a mature market.  As illustrated below, Defendants' effective prices inexplicably increased sharply beginning in July 2014:

FILED WITH REDACTIONS – PUBLIC VERSION



FILED WITH REDACTIONS – PUBLIC VERSION



The pricing conduct by each Defendant was not consistent with competition, but instead follows the pattern of "fair share" agreements that have been exposed in the generic drug industry by the States.  The foregoing graphs highlight the extreme price increases imposed by each Defendant in close succession.  The tables in the following paragraphs provide snapshots of the same pricing data and also show the extreme and parallel nature of Defendants' Econazole pricing.

66.      **Perrigo**: For over three years before the Class Period began, the average effective price per unit of its products was: ███████████████ for its 15 gm., 30 gm., and 85 gm. products respectively.

**FILED WITH REDACTIONS – PUBLIC VERSION**

67.     In June 2014, its effective prices were somewhat higher.  But in July 2014, it began a drastic increase of its effective prices:[40]

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| 15 gm crm. | | | | |
| 30 gm crm. | | | | |
| 85 gm crm. | | | | |

68.     Perrigo's effective prices would continue to climb, peaking several months later, increasing as much as 944% above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| 15 gm crm. | | | |
| 30 gm crm. | | | |
| 85 gm crm. | | | |

69.     Even today, Perrigo's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in November 2016, the price of its 15 gm. product was ▓ higher than in June 2014.

70.     **Taro**: For over three years before the Class Period began, the average effective price per unit of its products was: ▓ for its 15 gm., 30 gm., and 85 gm. products respectively.

---

[40] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

**FILED WITH REDACTIONS – PUBLIC VERSION**

71.     In June 2014, its effective prices were essentially the same.  But in August and September 2014, it began a drastic increase of its effective prices:[41]

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| 15 gm crm. | | | | |
| 30 gm crm. | | | | |
| 85 gm crm. | | | | |

72.     Taro's effective prices would continue to climb, peaking the following year, increasing as much as ████ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| 15 gm crm. | | | |
| 30 gm crm. | | | |
| 85 gm crm. | | | |

73.     Even today, Taro's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  ████████████████

| Product | Price Jun. 2014 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| 15 gm crm. | | | |
| 30 gm crm. | | | |
| 85 gm crm. | | | |

---

[41] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

FILED WITH REDACTIONS – PUBLIC VERSION

74.   **Teligent**:  In September 2013, when Teligent began to sell Econazole under its own label, it promptly began to raise effective prices for its Econazole products.  By June 2014, the average effective price per unit of its products was: ███████████████ for its 15 gm., 30 gm., and 85 gm. products, respectively.

75.   ████████████████████████████████████████████s.[42]

| Product | Price Jun. 2014 | Hike Date | Hike Price | Percentage Increase |
|---------|----------------|-----------|------------|---------------------|
| 15 gm crm. | | | | |
| 30 gm crm. | | | | |
| 85 gm crm. | | | | |

76.   Teligent's effective prices would continue to climb, ███████████████ ████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| 15 gm crm. | | | |
| 30 gm crm. | | | |
| 85 gm crm. | | | |

77.   Even today, Teligent's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, ███████████████ ████████████████████████

---

[42] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Price Jun. 2014 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| 15 gm crm. | | ███████████████ | |
| 30 gm crm. | | ███████████████ | |
| 85 gm crm. | | ███████████████ | |

**B.**    **As part of the conspiracy, Defendants increased their WAC benchmarks in lockstep.**

78.    Although MAC pricing has been implemented to discourage unilateral price increases of generic drugs by setting an upper limit, an individual manufacturer's WAC increase influences the actual prices paid by wholesalers. This is the case here, where Defendants dominate the Econazole market and raised their WACs to identical prices even though it meant ████████

████████████████████████ [43]

| Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 15 gm crm | ███ | ███ | ███ | ███ | ███ |
| 15 gm crm | ███ | ███ | ███ | ███ | ███ |
| 15 gm crm | ███ | ███ | ███ | ███ | ███ |

| Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 30 gm crm | ███ | ███ | ███ | ███ | ███ |
| 30 gm crm | ███ | ███ | ███ | ███ | ███ |
| 30 gm crm | ███ | ███ | ███ | ███ | ███ |

---

[43] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|---------|---------|------------------|---------------------|
| 85 gm crm | | | | | |
| 85 gm crm | | | | | |
| 85 gm crm | | | | | |

**C.    There are no shortages or other market changes that would justify Defendants' price increases.**

79.    During the Class Period, there was no significant increase in the costs of making Econazole, no significant decrease in supply, and no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for Econazole. Such price increases in a commodity product for which there were no significant increases in costs or demand and no significant decrease in supply would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

80.    Federal law requires mandatory drug shortage reporting for drug manufacturers.[44] Econazole is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA. Econazole also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010). None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Econazole.

---

[44] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

FILED WITH REDACTIONS – PUBLIC VERSION

81.     Nor does any change in marketplace explain the rising prices—before the Class Period, from December 2010 through June 2014, Defendants accounted for around ▮ of the direct sale of Econazole, and the prices and respective market shares of competitors remained relatively constant at these levels.  During the Class Period, Defendants maintained roughly ▮ of the market.

82.     There are no competitive explanations for these price hikes.  There were no supply shortages or disruptions, new patents or formulations, or changes in drug labeling that could explain the abrupt, dramatic, and uniform price hikes.  Defendants' price increases were not necessitated by increased manufacturing costs because Defendants realized record profits from Econazole sales during the relevant period.  To the contrary, anticompetitive activity explains these skyrocketing prices.  Pharmaceutical analyst Richard Evans at Sector & Sovereign Research explained potential causes of generic drug price hikes in a 2015 report:  "A plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics—low sales due to either very low prices or very low volumes—accommodate price inflation."[45]

(a)     Teligent, for one, was motivated to enter into a price fixing conspiracy as its business model depended on its ability to drive sales of Econazole.  In the years prior to joining this conspiracy, Teligent's expenses exceeded revenue "in each of the last nine years, and no net income has been available to common stockholders during each of these years."  Things were so bleak that Teligent warned, "[i]f we do not become profitable or continue to raise external financing, we could be forced to curtail operations and sell or liquidate our business."[46]

---

[45] *See* https://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.
[46] Teligent Form 10-Q, May 10, 2016.

41

(b)     The conspiracy allowed Teligent to become profitable **and** raise external financing.  In November 2014, by which time Teligent had ███████████████████ ████████████ it entered into an asset-based revolving senior secured credit facility with General Electric Capital Corporation.  In December 2014, Teligent entered into a purchase agreement pursuant to which the Company agreed to sell $125 million aggregate principal amount of its Notes to Deutsche Bank Securities Inc. and J.P. Morgan Securities LLC.

(c)     The supracompetitive prices that Teligent was able to impose because of the Econazole conspiracy had a profound economic effect on the company.  For example, Econazole accounted for 45% of the Company's total revenue during 2015. In contrast, in 2013 (before joining the Econazole conspiracy), Teligent did not have significant revenue from any one product.

83.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts. Wholesalers then sell the drug to pharmacies at a price based on the WAC. Independent pharmacies in particular cannot meaningfully negotiate their acquisition costs or their retail prices for insured patients (because these are subject to network agreements). Independent pharmacists may dispense drugs at a loss when they know certain uninsured patients will have trouble affording necessary drugs, but when the price increases are severe, the pharmacy's charity can reach only so far.

84.     Defendants' price increases for Econazole resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes.  Corresponding increases in Econazole's transactional prices demonstrate that increased WAC prices translate to increases in the prices paid by independent pharmacies.

42

**D.      Defendants acknowledge the lack of generic drug competition**

85.      Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.

86.      These dramatic price increases were the product of an illicit understanding among Defendants.  Public statements by Defendants' executives reflect their agreement to increase Econazole prices and maintain them at supracompetitive levels.

87.      For instance, during a second quarter earnings call on July 24, 2014, President and CEO of Teligent (then known as IGI Laboratories) Jason Grenfell-Gardner stated:  "[P]rices go up and prices go down.  What we as a management team have to do is to ensure that we remain alert and we try to maximize the value that we can."[47]

88.      On the next quarterly earnings call, on October 24, 2014, Grenfell-Gardner noted that maximizing value through price increases helped significantly increase the company's revenues:  "Year-to-date in 2014, we recognized $9.3 million in sales of IGI label products, that's an increase of 123% over the same period last year.  This growth has been driven partially through...significant price increases for core products in the portfolio."[48]

89.      Grenfell-Gardner explicitly discussed the "positive market conditions" for Econazole during a first quarter earnings call on April 28, 2015, stating:  "Over the last two quarters we've seen revenues accelerate as a result of positive market conditions for certain of our products notably for Econazole Nitrate Cream."  Echoing Grenfell-Gardner, CFO Jenniffer Collins

---

[47] IGI Labs., Transcript of Q2 2014 Earnings Call (July 24, 2014), *available at* https://seekingalpha.com/article/2341165-igi-laboratories-ig-ceo-jason-grenfell-gardner-on-q2-2014-results-earnings-call-transcript.

[48] IGI Labs., Transcript of Q3 2014 Earnings Call (Oct. 24, 2014), *available at* https://seekingalpha.com/article/2592775-igi-laboratories-ig-ceo-jason-grenfell-gardner-on-q3-2014-results-earnings-call-transcript.

**FILED WITH REDACTIONS – PUBLIC VERSION**

also attributed the "increase in net revenue" to Econazole, explaining that "[r]evenue from Econazole represented 53% of total revenue in the first quarter of 2015."[49]

90.    Teligent's 2016 annual report likewise reported that "net revenue from one product, Econazole nitrate cream 1% ... accounted for 8% and 45% of total revenues in 2016 and 2015, respectively."[50]

91.    Meanwhile, Perrigo stated in its 2014 annual report that "[b]roadening leadership in our core base business of extended topical products with limited competition and attractive margins is a strategic principle driving our continued outperformance in Rx."[51]

92.    Chairman, CEO, and President of Perrigo Joseph C. Papa stated on a May 7, 2014 quarterly earnings call that, while he "agree[d] that there are some opportunities for us in different business segments," "[w]e just want to be smart about how we look at those across our total business."  His strategy, Papa explained, is to maintain "pricing flat to up slightly across our total Perrigo businesses across all of our portfolio."[52]

93.    Papa reiterated this strategy on the August 14, 2014 quarterly earnings call, held within months of the spike in Econazole prices:  "I think there are some opportunities on pricing in the [prescription] category[.]"  On the same call, Papa announced "Fiscal 2014 adjusted net

---

[49] IGI Labs., Transcript of Q1 2015 Earnings Call (Apr. 28, 2015), *available at* https://seekingalpha.com/article/3113576-igi-laboratories-inc-ig-ceo-jason-grenfell-gardner-on-q1-2015-results-earnings-call-transcript/.

[50] Teligent, SEC Form 10-K (Mar. 15, 2017), at F-11, *available at* https://www.sec.gov/Archives/edgar/data/352998/000114420416088135/v433664_10k.htm.

[51] Perrigo, 2014 Annual Report, *available at* http://perrigo.investorroom.com/download/AnnualReport2014.pdf.

[52] Perrigo, Transcript of Q3 2014 Earnings Call (May 7, 2014), *available at* https://seekingalpha.com/article/2199773-perrigo-public-limiteds-prgo-ceo-joseph-papa-on-q3-2014-results-earnings-call-transcript.

**FILED WITH REDACTIONS – PUBLIC VERSION**

income increased 40% to $740 million" and attributed "[t]his strong performance" to "great executions especially within our [prescription] business segment."[53]

94.     On the February 5, 2015 quarterly earnings call, Papa noted that prescription drugs, such as Econazole, provided the "greatest upside" for pricing.  This upside was responsible for the fact that Perrigo's prescription business "once again achieved record results," in the first quarter of 2015, "growing sales 12% with an adjusted operating margin of 46%."[54]

95.     Taro CEO Kal Sundaram attributed the company's significant growth to price increases during a November 10, 2014 earnings call held just a few months after the Econazole price spike:

> In 2010, as per IMS data, Taro was ranked third among the gene[r]ic dermatology companies in USA.  In terms of sales, now it is ranked number one for the past three years.  U.S. remains the dominant market for Taro. Taro's earnings per share also has grown 50% CAGR, compounded annual growth, since 2010.  Taro's sales and earnings growth is attributable to upward price adjustments and the prudent life cycle management of our product portfolio while our overall volumes remain relatively constant and we remain cautious about the long-term sustainability of these prices.[55]

96.     Asked on the same November 10, 2014 earnings call about recent "significant price increases," Sundaram replied:

> Again market to volume fluctuations can happen for very different reasons . . . and when a new generation product comes, it will have [an] impact on the older generation product.  And once again I am saying generics remain to be sort of, what do you say cost value for money and

---

[53] Perrigo, Transcript of Q4 2014 Earnings Call (Aug. 14, 2014), *available at* https://seekingalpha.com/article/2424495-perrigos-prgo-ceo-joe-papa-on-q4-2014-results-earnings-call-transcript.

[54] Perrigo, Transcript of Q2 2015 Earnings Call (Feb. 5, 2015), *available at* https://seekingalpha.com/article/2895286-perrigo-company-prgo-ceo-joseph-papa-on-q1-2015-results-earnings-call-transcript.

[55] Taro, Transcript of Q2 2014 Earnings Call (Nov. 10, 2014), *available at* https://seekingalpha.com/article/2665835-taro-pharmaceutical-industries-taro-ceo-kal-sundaram-on-q2-2014-results-earnings-call-transcript.

**FILED WITH REDACTIONS – PUBLIC VERSION**

competitive.  I don't think there will be any significant—we have seen any significant impact of volume shifting because of price adjustments.[56]

97.     Sundaram again emphasized Taro's strategy of relying on high-priced generics on a May 27, 2016 quarterly earnings call, stating:  "We are a specialty generic company, so by definition, our portfolio will be obviously narrow but sort of focused.  We operate in niche markets; smaller volumes, but better priced."[57]

###### E.     Defendants had many opportunities to conspire on Econazole

98.     In order to be successful, collusive agreements require a level of trust among the conspirators.  While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.   Such industry conferences and other in-person meetings provided opportunities for Defendants to enter into, facilitate, implement, and enforce their conspiracy.

99.     For example, Defendants and/or their subsidiaries or affiliates are all members of the Association for Accessible Medicines ("AAM"), formerly known as the Generic Pharmaceutical Association ("GPhA").  AAM/GPhA bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs."  Its website promises that "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and enjoy "valuable membership services, such as business networking

---

[56] *Id.*
[57] Taro, Transcript of Q4 2016 Earnings Call (May 27, 2016), *available at* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8& ved=0ahUKEwjtl6uF2qzVAhWrrFQKHSswBNoQFggoMAA&url=http%3A%2F%2Fphx.co rporate- ir.net%2FExternal.File%3Fitem%3DUGFyZW50SUQ9NjM2NjIzfENoaWxkSUQ9MzQxMD c1ffFR5cGU9MQ%3D%3D%26t%3D1&usg=AFQjCNGYpzAax9qgrnNVcAK2qwCy_mBIo Q.

FILED WITH REDACTIONS – PUBLIC VERSION

opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[58]

100.    AAM/GPhA's current board of directors includes Stephen Manzano, Taro's Secretary, Group Vice President and General Counsel.   Perrigo Company's VP of global regulatory affairs Richard Stec also formerly sat on the industry group's board of directors.

101.    Defendants' representatives attended meetings held by GPhA during the relevant time period.  The following table lists some but not all of the GPhA meetings that Defendants' executives and employees attended in person:

| Meeting | Date and Location | Attendees |
|---|---|---|
| 2014 GPhA CMC Workshop | June 3–4, 2014 North Bethesda, Maryland | Perrigo, Taro, Teligent (IGI Labs) |
| 2014 GPhA Fall Technical Conference | October 27–29, 2014 North Bethesda, Maryland | Perrigo, Taro, Teligent (IGI Labs) |
| 2015 GPhA Annual Meeting | February 9–11, 2015 Miami Beach, Florida | Perrigo, Taro, Teligent (IGI Labs) |
| 2015 GPhA CMC Workshop | June 9–10, 2015 North Bethesda, Maryland | Perrigo, Taro |
| 2015 GPhA Fall Technical Conference | November 2–4, 2015 North Bethesda, Maryland | Perrigo, Taro, Teligent (IGI Labs) |

102.    Defendants used these in-person meetings to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Econazole, as well as other drugs, and to allocate markets and customers for Econazole.

103.    ███████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

[58] http://www.gphaonline.org/about/membership.

FILED WITH REDACTIONS – PUBLIC VERSION

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

104.     As the State AGs' investigation uncovered, Defendants' representatives and representatives from other generic drug manufacturers met at these various conferences and trade shows and discussed their respective businesses and customers.  These discussions occurred at related social events including lunches, cocktail parties, dinners, and golf outings.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.

105.     In addition to trade association meetings and events, Defendants and other generic manufacturers often participated in smaller group dinners and other private meetings.  A large number of generic drug manufacturers—including Defendants Taro, Teligent, and Perrigo—are headquartered in close proximity to one another in New York, New Jersey and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.

106.     High-level executives of many generic drug manufacturers get together periodically for "industry dinners."  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high ranking male executives,

including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

107.   Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings, and dinners, these representatives meet with their competitors and discuss competitively sensitive information. ████████████████

████████████████████████████████████████████

███████████████████████████████

108.   Thus, Defendants had numerous opportunities to meet and conspire at trade association meetings, as well as at industry healthcare meetings.

**F.    Defendants' concerted efforts to increase prices for Econazole yielded supracompetitive profits**

109.   Defendants' anti-competitive agreement led to skyrocketing prices for Econazole, as demonstrated in the charts above.

110.   The enormous price hikes were not accompanied by a significant change in costs to manufacturers.  Thus, the increased prices resulted in an enormous increase in profits to Defendants.

111.   For example, in 2013 Defendant Perrigo's net sales of Econazole totaled approximately $8 million.  As a result of Defendants' conspiracy, that number jumped to more than $65 million in 2014 and to nearly $80 million in 2015.

**G.    The Econazole market is susceptible to collusion**

112.   Publicly available data on the generic Econazole market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration;

(2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

### 1. Industry concentration

113. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. In July 2014, at the outset of the Class Period, the Defendants together accounted for roughly ███ of the market for these products.

114. While the market for Econazole is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

### 2. Barriers to entry

115. Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

116. There are significant capital, regulatory, and intellectual property barriers to entry in the generic Econazole markets that make such entry time-consuming and expensive.

117. Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Econazole markets.

118. Grenfell-Gardner and Collins of Teligent (formerly known as IGI Laboratories), also repeatedly acknowledged that the "US topical market" has "significant barriers to entry."

119. In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran

FILED WITH REDACTIONS – PUBLIC VERSION

commented on September 21, 2016, during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[59]   This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.    Demand inelasticity

120.    A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

121.    Demand for Defendants' Econazole products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics.  Additionally, the incentives of actors in the Econazole market are not sensitive to price, as they are in most other markets.   Doctors who prescribe Econazole have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written.  When Defendants increased their Econazole prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

122.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a

---

[59] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf .

FILED WITH REDACTIONS – PUBLIC VERSION

market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

### 4.    Lack of substitutes

123.    Econazole has a unique active ingredient, chemistry, and pharmacokinetics compared with other antifungals in its class.  There are no reasonable substitutes for Econazole that are therapeutically equivalent.

124.    Thus, Econazole is a necessity for the more than one million patients to whom it's prescribed and who must purchase it regardless of price hikes.  These purchasers are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized product with high degree of interchangeability

125.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

126.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price.  When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

127.    Defendants' generic Econazole products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

128.    Moreover, because generic Econazole products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.  Accordingly,

FILED WITH REDACTIONS – PUBLIC VERSION

manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[60]  The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.   Inter-competitor contacts and communications

129.   ███████████████████████████████████████

████████████████████████████████████████████

██████████████████   Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.  As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[61]

130.   The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events.  For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids, and fix prices of doxycycline hyclate and glyburide.

---

[60] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[61] PaRR Report.

FILED WITH REDACTIONS – PUBLIC VERSION

131.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[62]  The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

> (a)    **Aceto**: On April 23, 2018, Aceto disclosed: "In connection with the DOJ's ongoing investigation into marketing and pricing practices throughout the generic pharmaceutical industry, Aceto Corporation (the "Company") received a subpoena from the Antitrust Division of the U.S. Department of Justice (the "DOJ"). The Company is one of many operating companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry.[63]

> (b)    **Actavis**:  In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[64]

> (c)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[65]  The company stated that

---

[62] State AG Amended Complaint ¶ 7.

[63] Aceto, SEC 2018 Form 8-K (April 23, 2018), *available at* http://investor.aceto.com/static-files/6fed4dee-5d2f-419c-9c11-6b9828c079d1.

[64] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at 27, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[65] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

**FILED WITH REDACTIONS – PUBLIC VERSION**

it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[66]

(d) **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."  The Connecticut AG requested that Citron produce all documents produced to DOJ.[67]

(e) **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[68]

(f) **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[69] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.

(g) **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[70]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic

---

[66] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[67] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[68] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[69] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[70] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

prescription medications."[71]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.   In particular . . . digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[72]

(h)    **Lannett**:  In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[73]  On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."  The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[74]  On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[75]

(i)    **Mallinckrodt**:  "*Generic Pricing Subpoena.* In March 2018, the Company received a grand jury subpoena issued by the U.S. District Court for the Eastern District of Pennsylvania pursuant to which the Antitrust Division of the Department of Justice is seeking documents regarding generic products and pricing, communications with generic competitors and other related matters. The Company is

---

[71] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[72] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[73] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[74] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[75] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

in the process of responding to this subpoena, and the Company intends to cooperate fully in the investigation."[76]

(j) **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena...seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[77]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating:  "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products.  The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[78]

(k) **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to...generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[79]   On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[80]

---

[76] Mallinckrodt plc, SEC Form 10-Q at 24 (May 8, 2018), *available at* https://www.sec.gov/Archives/edgar/data/1567892/000156789218000025/mnk10-q033018.htm

[77] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[78] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[79] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[80] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(l)　**Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut Attorney General and DOJ relating to digoxin and doxycycline.[81]   In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania.   The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[82]   Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of the Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[83]

(m)　**Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[84]

(n)　**Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products...and related communications with competitors."[85]

---

[81] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[82] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[83] *Id.* at 31.

[84] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[85] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(o)    **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents...relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[86]

(p)    **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[87]

(q)    **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut Attorney General seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[88]

(r)    **West-Ward**:  "In 2017 the Group received two subpoenas from a US state attorney general and the US Department of Justice, each requesting information related to certain products, pricing and related communications."[89]

(s)    **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[90]

---

[86] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[87] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[88] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[89] Hikma Pharmaceuticals PLC, Annual Report 2017 at 163 (Mar. 14, 2018), *available at* https://hikma-investors.azurewebsites.net/_assets/pdf/Hikma-AR-2017.pdf

[90] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

**FILED WITH REDACTIONS – PUBLIC VERSION**

IX.   **THE STATUTES OF LIMITATION DO NOT BAR PLAINTIFFS' CLAIMS**

A.   **The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy**

132.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Econazole.

133.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Econazole.

134.   Plaintiffs are purchasers who indirectly purchased generic Econazole manufactured by one or more Defendants.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

135.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint.  For example:

> (a)   Perrigo's Code of Conduct provides:  "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices.  Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[91]

---

[91] Perrigo Code of Conduct, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(b) Taro's Code of Conduct provides:  "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate.  Leave the conversation immediately, and report the matter to Corporate Compliance."[92]

(c) IGI Laboratories's (predecessor to Teligent) Standards of Business Conduct state:  "IGI is committed to compliance with the anti-trust laws of the United States."[93]

136.   It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

137.   For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.   Fraudulent concealment tolled the statutes of limitations**

138.   In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Econazole.

139.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient

---

[92] Taro Code of Conduct, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf.

[93] IGI Laboratories Standards of Business Conduct, *available at* http://teligent.investorroom.com/download/2012+Standards+of+Business+Conduct.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Econazole.

140.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Econazole.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Econazole they purchased.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Econazole.  Defendants' false statements and conduct concerning the prices of generic Econazole were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Econazole at prices established by a free and fair market.

### 1.    Active concealment of the conspiracy

141.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

142.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes.  Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts.  The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Econazole.

143.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that,

Case 2:16-EC-27243-CMR   Document 40   Filed 04/01/19   Page 63 of 116

"[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[94]

144.    The Defendants also gave pretextual reasons for price increases.  For example, Taro's parent company, Taro Pharmaceutical Industries Ltd., stated in a 2014 annual filing with the SEC:  "The pharmaceutical industry in which we operate is intensely competitive.  The competition which we encounter has an effect on our product prices, market share, revenue and profitability."[95]  Teligent (when it was known as IGI Laboratories) used almost identical language in documents filed with the SEC in early 2015:  "The pharmaceutical industry in which we operate is intensely competitive.  The competition that we encounter has an effect on our product prices, market share, revenue and profitability."[96]  Perrigo's parent company, Perrigo Company plc, told the SEC in 2014:  "The market for generic prescription drugs is subject to intense competition from other generic drug manufacturers, brand-name pharmaceutical companies launching their own generic version of a branded product (known as an authorized generic), manufacturers of branded drug products that continue to produce those products after patent expirations and manufacturers of therapeutically similar drugs."[97]

---

[94] States Attorneys General's Amended Complaint ¶ 13.
[95] Taro Pharmaceutical Industries Ltd., SEC Form 20-F (July 2, 2014) at 3, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-sec.
[96] IGI Laboratories, Inc., SEC Form 10-K (Mar. 16, 2015) at 15, *available at* https://www.sec.gov/Archives/edgar/data/352998/000114420415016338/v404166_10k.htm.
[97] Perrigo Company plc, SEC Form 10-K (Aug. 14, 2014), at 8, *available at* https://www.sec.gov/Archives/edgar/data/1585364/000158536414000019/a2014q410k.htm.

63

**FILED WITH REDACTIONS – PUBLIC VERSION**

145.     These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain, and raise the price of generic Econazole to inflated, supracompetitive levels.

### 2.     Plaintiffs exercised reasonable diligence

146.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

147.     Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

148.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

149.     For these reasons, Plaintiffs' claims are timely under all of the federal, state, and common laws identified herein.

## X.     <u>CONTINUING VIOLATIONS</u>

150.     This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members

of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.   DEFENDANTS' ANTITRUST VIOLATIONS

151.   During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for generic Econazole sold in the United States.

152.   In formulating and effectuating the contract, combination, or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids, and artificially fix, raise, maintain, and/or stabilize the price of generic Econazole sold in the United States. These activities included the following:

(a)   Defendants participated in meetings and/or conversations regarding the price of generic Econazole in the United States;

(b)   Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Econazole sold in the United States;

(c)   Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Econazole; and

(d)   Defendants issued price announcements and price quotations in accordance with their agreements.

153.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

**FILED WITH REDACTIONS – PUBLIC VERSION**

154.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Econazole at inflated and supracompetitive prices.

155.     Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

156.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Econazole than they would have paid in a competitive market.

157.     General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacists, who cannot negotiate their acquisition costs. Wholesalers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Econazole.

158.     The unlawful contract, combination and conspiracy has had the following effects, among others:

          (a)     price competition in the market for generic Econazole has been artificially restrained;

          (b)     prices for generic Econazole sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)     purchasers of generic Econazole sold by Defendants have been deprived of

the benefit of free and open competition in the market for generic Econazole.

## XII.   CLASS ACTION ALLEGATIONS

159.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule

23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on

behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that
> indirectly purchased Defendants' generic Econazole products from July 1,
> 2014 through the present.
>
> This class excludes:  (a) defendants, their officers, directors, management,
> employees, subsidiaries, and affiliates; (b) all persons or entities who
> purchased Econazole products directly from defendants; (c) any pharmacies
> owned in part by judges or justices involved in this action or any members
> of their immediate families; (d) all pharmacies owned or operated by
> publicly traded companies.

160.   Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

common law of unjust enrichment and the state antitrust, unfair competition, and consumer

protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[98] on

behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that
> indirectly purchased Defendants' generic Econazole products (including
> cream and ointment) from July 1, 2014 through the present.[99]

---

[98] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska,
Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa,
Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New
York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina,
South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia,
Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin
Islands.

[99] Plaintiffs may seek to certify state classes rather than a single Damages Class.

**FILED WITH REDACTIONS – PUBLIC VERSION**

This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all persons or entities who purchased Econazole products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

161.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

162.    While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

163.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize prices of generic Econazole, and/or engaged in market allocation for generic Econazole sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling

FILED WITH REDACTIONS – PUBLIC VERSION

Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Econazole sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic generic Econazole, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

164.    Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Econazole purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

165.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

166.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

FILED WITH REDACTIONS – PUBLIC VERSION

167.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions, or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

168.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### XIII.   CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

169.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

170.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

FILED WITH REDACTIONS – PUBLIC VERSION

171.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially allocate customers, rig bids, and raise, maintain, and fix prices for generic Econazole, thereby creating anticompetitive effects.

172.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Econazole.

173.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Econazole have been harmed by being forced to pay inflated, supracompetitive prices for generic Econazole.

174.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth herein.

175.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for generic Econazole has been restrained, suppressed, and/or eliminated in the United States;

(b)   Prices for generic Econazole provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)   Plaintiffs and members of the Nationwide Class who purchased generic Econazole indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

176.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Econazole purchased

71

indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

177.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

178.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[100]
### (on behalf of Plaintiffs and the Damages Class)

179.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

180.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of generic Econazole in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

181.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Econazole and to allocate customers for generic Econazole in the United States.

182.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price

---

[100] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, ~~Connecticut,~~ District of Columbia, ~~Illinois,~~ Iowa, Kansas, Maine, ~~Maryland,~~ Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

72

generic Econazole at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Econazole provided in the United States; and

(b)     participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

183.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Econazole. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

184.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and the members of the Damages Class.

185.    Accordingly, Plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

186.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

187.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Econazole was restrained, suppressed, and eliminated throughout Alabama; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants'

FILED WITH REDACTIONS – PUBLIC VERSION

illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, *et seq*.

188.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Econazole was restrained, suppressed, and eliminated throughout Arizona; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

189.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Econazole at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and

concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Econazole. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Econazole. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Econazole has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Econazole provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Econazole indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Econazole than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

190. **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels

throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Econazole in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Econazole in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Econazole, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

~~191.   **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.~~

**FILED WITH REDACTIONS – PUBLIC VERSION**

~~Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.~~[101]

192.   **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

193.   **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Econazole, increasing the prices of generic Econazole, preventing competition in the sale of generic Econazole, or binding themselves not to sell generic Econazole, in a manner that established the price of generic Econazole and precluded free and unrestricted competition among themselves in the sale of generic Econazole, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas. During the

---

[101] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

194.   **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

195.   **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan

Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

196.    **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

197.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

198.    **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

199.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been

FILED WITH REDACTIONS – PUBLIC VERSION

injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

200.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

201.    **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the

Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

202.   **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

203.   **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a

**FILED WITH REDACTIONS – PUBLIC VERSION**

direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

204.   **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

205.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of

FILED WITH REDACTIONS – PUBLIC VERSION

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

206.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

207.    **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As

FILED WITH REDACTIONS – PUBLIC VERSION

a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

208.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

209.    **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of

FILED WITH REDACTIONS – PUBLIC VERSION

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

210.   **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

211.   **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a

substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

212.   **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably, and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

212a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Econazole price

competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

212b. **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Econazole and raised, fixed, maintained, and stabilized generic Econazole prices at artificially high levels. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

213. **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Damages Class have paid more for generic Econazole than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the

FILED WITH REDACTIONS – PUBLIC VERSION

above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

214.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

215.     Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[102]
### (on behalf of Plaintiffs and the Damages Class)

216.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

217.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

218.     **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

---

[102] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia, Michigan,~~ Minnesota, Nebraska, ~~Nevada,~~ New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina,~~ South Dakota, ~~West Virginia,~~ Wisconsin, and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Econazole was sold, distributed, or obtained in Alaska, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

219.   **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Econazole was sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and

proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

220. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Econazole in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise

unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Econazole in the State of California within the meaning of § 17200, California Business and Professions Code; (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of § 17200 of the California Business and Professions Code; and Defendants unlawfully raised prices of Econazole, a medical supply, by more than 10% during the 30 days following a declaration of a state of emergency in California, in violation of the California Penal Code § 396, thereby committing "unlawful" and "unfair" prohibited business practices under § 17200.[103] Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Econazole. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by

---

[103] States of Emergency for California were declared on at least August 22, 2012; July 12, 2013; August 22, 2013; August 23, 2013; September 20, 2013; September 30, 2013; October 31, 2013; January 17, 2014; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September 17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 31, 2015; September 11, 2015; September 13, 2015; December 18, 2015; February 1, 2016; February 19, 2016; April 19, 2016; June 7, 2016; June 24, 2016; July 26, 2016; July 9, 2016; and August 16, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

221. **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

222. **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of

93

the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

223.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected

FILED WITH REDACTIONS – PUBLIC VERSION

Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

224.    ~~**Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*.~~ ~~Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at~~

~~prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities~~ ~~constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiffs and members~~ ~~of the Damages Class seek all relief available under that statute and as equity demands.~~[104]

~~225.~~ **~~Michigan:~~** ~~Defendants have engaged in unfair competition or unfair,~~ ~~unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection~~ ~~Statute, Mich. Compiled Laws § 445.903, *et seq.* Defendants agreed to, and did in fact, act in~~ ~~restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining,~~ ~~at artificial and non-competitive levels, the prices at which generic Econazole was sold,~~ ~~distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to~~ ~~Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and~~ ~~artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers~~ ~~during the Class Period that Defendants' generic Econazole prices were competitive and fair.~~ ~~Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition~~ ~~was restrained, suppressed, and eliminated throughout Michigan; (2) generic Econazole prices~~ ~~were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan.~~ ~~During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan~~ ~~commerce and consumers. As a direct and proximate result of Defendants' violations of law,~~ ~~Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property~~ ~~as a result of Defendants' use or employment of unconscionable and deceptive commercial~~ ~~practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct,~~ ~~as described herein. Defendants' deception, including their affirmative misrepresentations and~~

---

[104] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

~~omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

226.   **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

227.   **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially

**FILED WITH REDACTIONS – PUBLIC VERSION**

high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Econazole in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

228.   **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole,

~~likely misled all purchasers acting reasonably under the circumstances to believe that they were~~ ~~purchasing generic Econazole at prices set by a free and fair market. Defendants' misleading~~ ~~conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*,~~ ~~and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that~~ ~~statute.~~

229.   **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Econazole in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

230.   **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of

the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair.  Defendants Perrigo and Taro raised prices of Econazole, which is "used to preserve, protect, or sustain the life, health, safety or comfort of persons," by more than 10% within 30 days of the termination of a state of emergency in New Jersey, in violation of N.J. Statutes § 56:8-107 *et seq.*[105]  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J.

---

[105] States of emergency for New Jersey were declared on at least October 27, 2012; October 28, 2012; February 11, 2013; January 2, 2013; January 21, 2014; November 26, 2014; December 23, 2014; January 26, 2015; March 4, 2015; and January 22, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

231.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Econazole was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Econazole as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Econazole because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Econazole, including their illegal conspiracy to secretly fix the price of generic Econazole at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted

FILED WITH REDACTIONS – PUBLIC VERSION

from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Econazole. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

232.   **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in New York, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Econazole that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Econazole; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Econazole were misled to

**FILED WITH REDACTIONS – PUBLIC VERSION**

believe that they were paying a fair price for generic Econazole or the price increases for generic Econazole were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Econazole would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Econazole would have a broad impact, causing consumer class members who indirectly purchased generic Econazole to be injured by paying more for generic Econazole than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Econazole in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

233.   **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1,

FILED WITH REDACTIONS – PUBLIC VERSION

*et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed or obtained in North Carolina, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. Defendants Perrigo and Taro charged "unreasonably excessive" prices for Econazole, which is a good "consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property," in the 45 days following a declaration of a state of emergency by the Governor, in violation of North Carolina. Gen..Stat. § 75-38 and § 75-1.1.[106] The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North

---

[106] States of Emergency for North Carolina were declared on at least October 29, 2012; March 12, 2013; June 14, 2013; September 12, 2013; January 28, 2014; February 11, 2014; April 28, 2014; July 2, 2014; January 26, 2015; February 16. 2015; February 25, 2015; October 1, 2015; January 20, 2016; and February 17, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Econazole in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

234.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive

and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

235. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the

FILED WITH REDACTIONS – PUBLIC VERSION

~~Damages Class have been injured in their business and property and are threatened with further~~
~~injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in~~
~~violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the~~
~~Damages Class seek all relief available under that statute.~~[107]

236.    **South Dakota:** Defendants have engaged in unfair competition or unfair,
unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade
Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants
agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting,
fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which
generic Econazole was sold, distributed, or obtained in South Dakota. Defendants deliberately
failed to disclose material facts to Plaintiffs and members of the Damages Class concerning
Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants
misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices
were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic
Econazole price competition was restrained, suppressed, and eliminated throughout South Dakota;
(2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels
throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota
commerce and consumers. As a direct and proximate result of Defendants' violations of law,
Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property
as a result of Defendants' use or employment of unconscionable and deceptive commercial
practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct,

---

[107] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February
15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of
preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition, or unfair or deceptive acts or practices, in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

237. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law,

FILED WITH REDACTIONS – PUBLIC VERSION

Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.[108]

238.    **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic

---

[108] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

239. **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Econazole. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants'

**FILED WITH REDACTIONS – PUBLIC VERSION**

generic Econazole prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Econazole prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Econazole, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Econazole at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Econazole they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[109]
### (on behalf of Plaintiffs and the Damages Class)

240.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[109] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas,

241.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

242.    Defendants have unlawfully benefited from their sales of generic Econazole because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Econazole at prices that were more than they would have been but for Defendants' unlawful actions.

243.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

244.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

245.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Econazole while Plaintiffs have been impoverished by the overcharges they paid for generic Econazole imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

246.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit,

---

Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

247.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

248.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Econazole.

249.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Econazole are ascertainable by review of sales records.

250.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Econazole.

251.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Econazole, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

252.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Econazole is a direct and proximate result of Defendants' unlawful practices.

FILED WITH REDACTIONS – PUBLIC VERSION

253.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

254.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Econazole derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

255.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Econazole prices remain inflated above pre-conspiracy levels.

256.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Econazole.

257.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Econazole by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice

FILED WITH REDACTIONS – PUBLIC VERSION

of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner

**FILED WITH REDACTIONS – PUBLIC VERSION**

continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.


## XV.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 21, 2018                              Respectfully submitted,


                                                     /s/  Jonathan W. Cuneo

Peter Gil-Montllor                          Jonathan W. Cuneo
Christian Hudson                            Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**             Daniel Cohen
16 Court Street, Suite 1012                 Victoria Romanenko
Brooklyn, NY 11241                          Blaine Finley
202-789-3960                                **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                  4725 Wisconsin Ave., NW Suite 200
                                            Washington, DC 20016
                                            202-789-3960
                                            jonc@cuneolaw.com

                                            *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**